**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **VICKIE BUCHANAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case number 4:13cv1079 TCM** |
| ) | |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final

decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner),

denying the applications of Vickie Buchanan for disability insurance benefits ("DIB") under

Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401-433, and for supplemental

security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the

undersigned by written consent of the parties. See 28 U.S.C § 636(c).

### Procedural History

In May 2009, Vickie Buchanan (Plaintiff) applied for DIB and SSI alleging that she

became disabled on June 1, 2000, because of anxiety, depression, and headaches. (R.[1] at

220-22, 223-31, 288.) Plaintiff subsequently amended her alleged onset date to January 16,

2008. (Id. at 258.) Her applications were denied initially and after a March 2010

---

[1]References to "R." are to the administrative record filed by the Commissioner with her
answer.

administrative hearing before Administrative Law Judge ("ALJ") J. Pappenfus. (Id. at 43-57, 69, 70, 95-100.) Two months later, the ALJ issued a decision denying Plaintiff's applications. (Id. at 71-85.) The Appeals Council granted Plaintiff's request for review of the ALJ's decision and remanded the matter to the ALJ, finding the ALJ's assessment of Plaintiff's residual functional capacity ("RFC") to be inconsistent with the performance of Plaintiff's past relevant work as a healthcare provider, as well as inconsistent with the ALJ's findings relating to the severity of Plaintiff's mental impairment. The Appeals Council ordered the ALJ to, inter alia, give further consideration to Plaintiff's maximum RFC and to obtain vocational expert testimony to address the issue of whether Plaintiff could perform her past relevant work or other work as it exists in the national economy. (Id. at 89-93.)

Pursuant to the Appeals Council's directive, the ALJ conducted supplemental hearings in December 2011. (Id. at 58-68, 26-42.) The ALJ then issued a decision again denying Plaintiff's applications. (Id. at 7-19.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision, effectively adopting that decision as the final decision of the Commissioner. (Id. at 1-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the March 2010 hearing.

At the time of the hearing, Plaintiff lived in a home with two of her children, ages twenty and twenty-one. She had attended college for two years, received computer training

at a community college, and received training as a nurse's aide and in hotel hospitality. (Id. at 46-47, 51-52.)

Plaintiff testified that she was currently depressed, had no energy, and cried all of the time. She stays in bed, does not go anywhere, and does not want to be bothered. She has difficulty remembering things and sometimes questions why she is here. Plaintiff currently sees Dr. Byrd, a psychiatrist at the Crider Health Center, once a month and visits a case manager/social worker three or more times a week. (Id. at 49-50, 55.)

As to her daily activities, Plaintiff testified that she wakes up at 10:00 a.m., gets up to go the bathroom, and then lies back down for the remainder of the day unless she has an appointment. She spends most of the day in bed. She sometimes does the dishes but she does not straighten up around the house or do any heavy cleaning, laundry, grocery shopping, or cooking. Her oldest daughter performs such chores. Plaintiff has no friends and is not visited by any family members. She recently began attending church, but she does not engage in any other activities with the exception of going to clinic appointments. (Id. at 53-54.)

At the first December 2011 supplemental hearing,[2] Delores E. Gonzalez, M.Ed., V.R.C.,[3] testified as a vocational expert ("VE").

---

[2] Plaintiff was unable to attend this hearing. A supplemental hearing was held two weeks later to obtain her additional testimony.

[3] Vocational Rehabilitation Counselor.

Ms. Gonzalez classified Plaintiff's past work as a cashier as light and semi-skilled; as an office cleaner as heavy and unskilled; as a psychiatric aide as medium and semi-skilled; as a hotel housekeeper and convenience store clerk as light and unskilled; and as an order picker and prep cook as medium and unskilled. (Id. at 63.)

The ALJ asked Ms. Gonzalez to assume that Plaintiff was limited to medium and unskilled work, to which Ms. Gonzalez responded that Plaintiff could perform her past work as a convenience store clerk, hotel housekeeper, order picker, and prep cook. The ALJ then asked Ms. Gonzalez to assume that Plaintiff was limited to light and unskilled work. She responded that Plaintiff could perform her past work as a convenience store clerk and housekeeper. (Id. at 63-64.)

Counsel asked Ms. Gonzalez to consider the person to also be limited to only occasional contact with coworkers, supervisors, and the general public. Ms. Gonzalez testified that such a person could perform Plaintiff's past work as a hotel housekeeper. Ms. Gonzalez further testified that the person could continue to perform such work if she was limited to less than occasional contact with others, even if such limited contact consisted of less than ten percent per day. (Tr. 64-65.)

Counsel then asked if work was available for a person who would "in a fit of anger berate or go off on a fellow employee or supervisor," to which Ms. Gonzalez testified that such behavior is usually not tolerated and is a reason for dismissal. (Tr. 65.)

As noted above, Plaintiff testified at the second supplemental hearing.

Plaintiff testified that her eighteen-year-old daughter currently lived at home with her. (<u>Id.</u> at 29.)

Plaintiff further testified that she has difficulty being around people in that she is quickly agitated and gets angry and frustrated. (<u>Id.</u> at 37.) She "gets mad to the point where [she] shake[s]" and urinates on herself. She has not yet told a doctor of these occurrences. (<u>Id.</u> at 40.) She takes medication as prescribed through Crider Center, she has been compliant with her treatment regimen, and continues to see a psychiatrist. (<u>Id.</u> at 33, 39.) She does not see any other counselors. (<u>Id.</u> at 39.)

Also, Plaintiff experiences headaches that awaken her from her sleep. She has not yet told a doctor about the headaches, but had an upcoming appointment regarding the condition. (<u>Id.</u> at 39-41.)

Describing her daily activities, Plaintiff testified that she gets up at 11:00 a.m. and does nothing throughout the day. She does not cook, go grocery shopping, straighten up the house, or do yard work. Sometimes, she does the dishes. Sometimes, she sweeps, mops, or vacuums. She usually lies in bed during the day and either sleeps or stares out into space. (<u>Id.</u> at 34-35.) She used to take a nap once or twice a day, but that she has been napping constantly during the previous two months. (<u>Id.</u> at 35-36.) Her mother occasionally calls, but, with the exception of her daughters, Plaintiff is not in contact with other family members. She has no friends. Approximately one year earlier, she stopped attending church. (<u>Id.</u> at 36-37.)

## Medical and Other Records Before the ALJ

When applying for DIB and SSI, Plaintiff completed a Work History Report, disclosing that, on unspecified dates, she worked as a home healthcare provider, a hotel housekeeper, a temporary prep cook at a hospital, an order picker at a warehouse, and a cashier at The Dollar Store. (Id. at 307.)

Her medical records are summarized below in chronological order.

In January 2008, Plaintiff, then thirty-nine years old, was taken to the emergency room at St. Joseph Health Center by her daughter's counselor with reports that Plaintiff was "emotionally stressed." Her admitting diagnosis was depression with psychosis. She also complained of anxiety. Plaintiff explained that her current state was caused by caring for three children and looking for a job. She was very disturbed about her financial issues, and complained of increased insomnia and hopelessness. It was reported that Plaintiff was angry and hostile. On examination, Plaintiff was depressed, anxious, tearful, and in mild distress. She was noted to be cooperative and to maintain good eye contact. She had normal speech and appropriate affect. She denied any suicidal or homicidal ideation. Plaintiff was diagnosed with depressive disorder, not otherwise specified and was assigned a Global Assessment of Functioning ("GAF") score of 35.[4] Plaintiff was given Ativan and Motrin

---

[4]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Test Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV-TR at 34 (emphasis omitted).

and was discharged that same date in improved and stable condition.  She was referred to the Crider Health Center (Crider) for further treatment.  (Id. at 415-31.)

In February, Plaintiff saw Dr. James Byrd at Crider, reporting having had depressive symptoms for the past seven to eight years and a history of anxiety.  She complained of decreased energy and anhedonia.  A mental status examination showed her to have a low mood, flat affect, and limited insight and judgment.  She was cooperative and nonthreatening.  She put forth poor effort with memory examination.  Dr. Byrd diagnosed Plaintiff with major depression with symptoms of anxiety and assigned her a GAF score of 60.[5]  He prescribed Celexa, trazodone, and Ativan.  (Id. at 566-67.)  The next month, Plaintiff reported to Dr. Byrd that the medication had initially helped but she currently felt more depressed.  He instructed her to increase her dosage of Celexa and trazodone.  (Id. at 565.)

Plaintiff next saw Dr. Byrd on June 4.  She was irritable because she had run out of her medications.  Plaintiff reported that her main worries were about her finances.  Dr. Byrd noted that her sleep and appetite were fair; her mood was sad and low with a congruent affect; her insight and judgment were fair.  She was alert and oriented to time, place, and person.  She had no hallucinations, delusions, or suicidal or homicidal ideations.  She was nonthreatening.  Dr. Byrd diagnosed Plaintiff with major depression and anxiety disorder and

---

[5]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

prescribed Celexa, trazodone, and hydroxyzine. He instructed Plaintiff to discontinue Ativan and to return in four weeks. (Id. at 480.)

One week later, Plaintiff underwent an assessment at Crider for Community Support Services ("CSS"). She reported that she needed help. She was stressed, depressed, had a poor memory, had poor sleep, and had a poor appetite. She did not have any disruptive behaviors such as physical aggression or property damage, but admitted to recently flipping over a glass table because of frustration. Plaintiff further reported that she wanted to work because she needed to pay her bills but was currently unemployed because of too much stress. She did her own shopping and, when she wanted to, prepared her own meals. She enjoyed going to movies and sitting at the park. She read the Bible and watched television on Sundays, but did not attend church because she had not found one that she liked. She had no energy. She cleaned her home when she was angry so that she would not fuss at her children. No perceptual disturbances were noted. Plaintiff was noted to have a good ability to think abstractly and to have fair judgment, but her insight into understanding her mental illness seemed poor. She was diagnosed with major depressive disorder, severe, without psychotic features; and anxiety disorder, not otherwise specified. Her current GAF was assessed as being 45.[6] Multiple recommendations were made, including that Plaintiff apply for social security and Medicaid as well as seek employment. Dr. Byrd reviewed this evaluation and consulted with the treatment team regarding Plaintiff's need for services. (Id.

---

[6]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

at 483-87.)  On June 18, Dr. Byrd noted that disability forms had been prepared for Plaintiff. (Id. at 479.)

On July 2, Plaintiff reported to Dr. Byrd that she was frustrated over situations involving her son and daughter and that her appetite and sleep were off because of stress. She had received her Medicaid card but some of her utilities had been shut off.  On examination, Plaintiff was cooperative and alert and oriented to time, place, and person.  She was tearful because of her stress.  Anhedonia was noted.  Her mood was better; her affect was blunted; her insight and judgment were fair.  Her diagnosis was unchanged.  Plaintiff was instructed to continue with her medications and to follow up with her case worker.  (Id. at 478.)

Plaintiff returned to Dr. Byrd on July 30, reporting that she had been hired at Dollar Tree.  He noted that she was more positive.  Plaintiff reported that was not as depressed and that was not "stay[ing] mad as long."  She felt the medications were helping her, and Dr. Byrd noted that she was compliant with her medication regimen.  She had a better mood and a brighter affect on examination.  She was instructed to continue with her medications.  (Id. at 475.)

In September, Plaintiff reported to Dr. Byrd that her car had broken down and that she might quit her job because she would have to walk to work.  Also, having a job "cost her the Medicaid."  She had missed several doses of medication, but the medications worked when she took them.  On examination, she was sad, tearful, frustrated and had limited insight and judgment.  She was alert and oriented to time, place, and person.  Dr. Byrd noted that

Plaintiff would not cooperate. He diagnosed her with major depression, moderate, and anxiety disorder and continued her on her medications. (Id. at 470.) Later that month, Dr. Byrd noted that Plaintiff was in a better mood and euthymic, but she continued to have limited insight and judgment. (Id. at 467.) That same day, her case worker noted that Plaintiff's mood appeared to be a bit unstable during the month with some references to depression. Plaintiff reported being compliant with her medications, but also admitted that she sometimes forgot to take her medications. (Id. at 466.)

Plaintiff returned to Dr. Byrd in October, reporting that the medications were helping. She was compliant with her medications. She also reported that her sleep and mood were better. She wanted to return to her old job. On examination, Plaintiff had a bright affect but continued to have limited insight and judgment. Her diagnoses were unchanged. She was to continue with her medications. (Id. at 462.) On that same date, Plaintiff met with a new case worker, Diane Appal, and was upset regarding the change and "expressed such [with] vulgarity." It was noted that Plaintiff appeared angry and depressed and showed a lack of coping skills. It was also noted that Plaintiff was no longer working. (Id. at 463.)

In November, Plaintiff reported to Dr. Byrd that she gets frustrated easily. Mental status examination showed Plaintiff to have a frustrated mood and a blunt affect, but to be cooperative. Her diagnoses and her medications were unchanged. (Id. at 460.) On that same date, Ms. Appal described Plaintiff's as slightly more stable. (Id. at 461.)

Plaintiff met with Ms. Appal again on December 8, reporting continued interest in securing employment. Ms. Appal encouraged her to follow through with social security.

Plaintiff reported that she was not sleeping, and Ms. Appal noted that she was depressed and extremely negative. with a flat affect. Plaintiff discussed recent life events regarding her daughter, and stated that she and her daughter needed to get away from each other because she could hurt her daughter out of anger. (Id. at 457.) During a community visit four days later, Ms. Appal expressed concern about Plaintiff's anger, having witnessed Plaintiff's verbal abuse to her dogs and to her children. Ms. Appal noted Plaintiff appeared depressed and very angry. Plaintiff reported that the medications were not helping her. Ms. Appal determined to work with Plaintiff about attending anger management classes. (Id. at 459.) On December 16, Plaintiff reported to Dr. Byrd that she was recently angry about her daughter being hospitalized but had been able to rest during that period. He instructed her to continue with her medications. (Id. at 455.)

Plaintiff returned to Dr. Byrd in January 2009, informing him that her daughter had run away from the treatment facility and that she was worried about her. Consequently, Plaintiff had not been taking her medications, but she planned on resuming doing so. On examination, she was emotional and angry. She had a logical and sequential thought process, but poor insight and judgment. Dr. Byrd noted increased passive/ aggressiveness. Her diagnoses and medications were unchanged. (Id. at 453.) That same day, Plaintiff reported to Ms. Appal that she no longer wanted to associate with Crider, blaming Crider for her and her daughter's situation. Ms. Appal described Plaintiff as continuing to demonstrate "anger at the world in general." (Id. at 454.)

In February, Dr. Byrd described Plaintiff as being better and having a bright affect. Her insight and judgment continued to be poor but had improved. (Id. at 450.) Plaintiff told Ms. Appal that she was now compliant with her medications. Ms. Appal noted Plaintiff to continue to appear depressed and very angry. (Id. at 451.)

During a periodic review of Plaintiff's CSS plan in March, it was noted that Plaintiff kept all her appointments and reported being compliant with her medications. It was further noted that Plaintiff desired to find a job but did not seek employment, reporting that she had court dates involving the custody of her daughter and would not want to be absent from a new job in order to attend court. It was also noted that Plaintiff was making progress with paying her utilities and bills and that she was going to restart the process to obtain social security benefits. (Id. at 488-92.)

That same month, Plaintiff reported to Dr. Byrd that she did not know her daughter's whereabouts and felt overwhelmed by her daughter's situation. Plaintiff's insight and judgment were noted to be poor. Dr. Byrd prescribed Abilify and increased Plaintiff's dosage of trazodone. Plaintiff was kept on her current dosages of Celexa and hydroxyzine. (Id. at 449.) Two weeks later, Plaintiff informed Dr. Byrd that she felt better with her current medications. She was noted to be in a good mood and, on examination, showed improvement. (Id. at 446.)

In April, Dr. Byrd instructed Plaintiff to increase her dosage of Abilify in response to her ongoing problems with depression. (Id. at 444.) Then next month, Plaintiff reported that she was doing about the same and was continued on her medications. (Id. at 440.)

Plaintiff returned to Dr. Byrd in June, reportedly having multiple social stressors and not sleeping well. Mental status examination showed her to have a fair mood, a blunt affect, and limited insight and judgment. She was cooperative. Her medications were renewed. (Id. at 521.)

Plaintiff underwent her annual CSS assessment at in July. She reported that she had been feeling fine until the unexpected death of her aunt the previous week. She was having mood swings in that she felt fine at home but, when around certain people, felt her heart pound and would shake. These mood swings were situational. Plaintiff reported that she began having anxiety attacks years ago because her children argued and fought all the time. She described having been hospitalized for an anxiety attack five years earlier when she was shaking and urinating on herself, but had then improved after her children were removed from her home and placed in foster care for two years. Plaintiff further reported that her oldest daughter currently came and went, sometimes staying with her. Her son was incarcerated and her youngest daughter was in DFS custody. Plaintiff stated that she currently did her own shopping and meal preparation, although she ate once a day. She occasionally worked on a puzzle, but engaged in no other leisure activities. Her current medications were trazodone, Celexa, Zoloft, hydroxyzine, and Abilify. Plaintiff reported that these medications were helpful and that she had no problems taking them. When she did not take them, she got mad, frustrated, and angry. On examination, Plaintiff was fully oriented, displayed a normal memory, was calm and relatively cooperative, and had a generally pleasant attitude. Her judgment was fair, but her insight into her mental illness was poor. It

was noted that she was occasionally defensive and appeared guarded with some responses. She was diagnosed with major depressive disorder, recurrent, severe and anxiety disorder. Her GAF was 48. (Id. at 522-30.) Dr. Byrd signed this assessment in August 2009. (Id. at 529.)

The next week, Plaintiff reported to Dr. Byrd that she had been compliant with her medications but had decreased appetite and increased sleep disturbances. She had periods of sadness. Increased irritability and anger was noted. Plaintiff was instructed to decrease her dosage of Celexa, and Zoloft was prescribed. Plaintiff was continued on her other medications. (Id. at 520.)

During a quarterly review of the CSS plan in September, it was noted that Plaintiff was attending vocational rehabilitation in an effort to secure employment; was meeting court dates, attending family therapy, visiting her daughter in an effort to regain custody; was attending all psychiatry appointments and taking medications as prescribed, and was fulfilling all requests from her attorney and from the social security office with respect to applying for benefits. Her current GAF score was 55. (Id. at 531-40.) Dr. Byrd signed this review on October 13. (Id. at 540.)

Plaintiff visited Dr. Byrd the same day, reporting that she had no new problems but more patience. Mental status examination continued to show Plaintiff to have limited insight and judgment but was otherwise unremarkable. Dr. Byrd instructed Plaintiff to continue with trazodone, Zoloft, hydroxyzine, and Abilify. (Id. at 519.)

In October, Plaintiff reported to Dr. Byrd that she was continuing to worry about finances. Her sleep was fair; her mood was low and frustrated; her affect was angry and sad. She was continued on her medications. (Id. at 518.)

Plaintiff returned to Dr. Byrd in November. He noted that she continued to have social and financial difficulties with continued irritability. She was described as exhibiting increased self-pity and having poor insight and judgment. She was instructed to discontinue hydroxyzine, start taking Thorazine, and continue taking her other previously-prescribed medications. (Id. at 548.)

 In January 2010, Plaintiff complained to Dr. Byrd of increased stress caused by the death of her father and the return home of her daughter. Her medications were renewed. (Id. at 550.)

In March, Plaintiff reported to Dr. Byrd that she had decreased energy and stayed in bed a lot. Increased anhedonia was noted. It was also noted that Plaintiff was compliant with her medication regimen. Plaintiff's insight and judgment were limited, but her mental status examination was otherwise unremarkable. Her medications were continued. (Id. at 551.)

That same month, during a review of Plaintiff's CSS plan, a GAF score of 55 was assigned. It was noted that Plaintiff kept her appointments and reported being compliant with her medication. She was attending all court proceedings involving regaining custody of her daughter and participating in family therapy. She had  temporarily stopped

participating in vocational rehabilitation because of transportation difficulties. (Id. at 553-63.)

At her next, April visit to Dr. Byrd, Plaintiff reported that she was tired of sitting in the house. Worries were interfering with her sleep. Mental status examination showed Plaintiff to have a fair mood and blunted affect, with limited insight and judgment. Plaintiff was continued in her diagnoses and with her medications and was referred to Headway.[7] (Id. at 572.) Plaintiff was again referred to Headway in May. (Id. at 573.)

In June, Plaintiff complained to Dr. Byrd of having bad dreams, being irritable at night and negative during the day, and constantly feeling sad and frustrated. He noted that she was angry and had poor insight and judgment. He instructed her to increase her dosage of Abilify. (Id. at 574.)

The next month, Plaintiff reported to Dr. Byrd that she had difficulty going to sleep and continued to occasionally have bad dreams. It was noted that Plaintiff recently attended Headway. Mental status examination showed Plaintiff to be in a better mood but to have a blunted affect with poor insight and judgment. Her speech was clear but monotoned. Dr. Byrd described Plaintiff as having improved during the previous month, assigned her a GAF of 50-55, and continued her on her medications. (Id. at 575.)

---

[7]Although Headway is not further identified in the administrative record, it appears from an Internet search that it is a job agency.

In August, Plaintiff was again described by Dr. Byrd as being angry. Her thought process was circumstantial; her insight and judgment were poor; her GAF was 50. She was to continue with her medications and again increase her dosage of Abilify. (Id. at 576-77.)

Plaintiff's mood was better at her September visit to Dr. Byrd, but he noted that she continued to have difficulty with her children. (Id. at 578-79.)

Plaintiff returned to Dr. Byrd in November, reporting that she was caring for her granddaughter. She was partially compliant with her medications. Her mood was better and her affect improved, but her insight and judgment were limited. Her diagnoses and medications were unchanged. (Id. at 580-81.)

In January, Plaintiff reported to Dr. Byrd that her son, daughter, and granddaughter lived with her, which was overwhelming. She was waking up mad and was frustrated with the arguing. Plaintiff was continued on her medications. (Id. at 582-83.)

In March, Dr. Byrd described Plaintiff as being very irritable. She reported that the past month had been hectic, that there was always noise, and that, because of the stress, she had daily headaches. Plaintiff's grooming was noted to be poor. On examination, her thought process was illogical; her behavior was evasive; and her insight and judgment were poor. She was instructed to increase her dosage of trazodone. (Id. at 584-85.)

In May, Plaintiff reported to Dr. Byrd that she was easily angered. Her mental status had improved, but her insight and judgment had not. She was continued on her medications. (Id. at 586-87.)

Plaintiff failed to appear for her scheduled appointment with Dr. Byrd in June. (Id. at 586.)

In August, Plaintiff underwent a psychiatric evaluation at BJC Behavioral Health Services upon referral for continuation of psychiatric treatment and case management services. Plaintiff was then forty-two years of age. She complained of excessive worrying, feeling jumpy and edgy, shaking when under stress, and having low energy, variable sleep, and reduced concentration. Plaintiff denied anhedonia. She periodically experienced a sense of worthlessness, but denied any sense of hopelessness or helplessness. Dr. Asif Qaisrani noted ongoing paranoia. Dr. Qaisrani noted Plaintiff's previous psychiatric treatment with Crider and her current medications, including Zoloft, Abilify, trazodone, and Thorazine. On examination, Plaintiff had appropriate hygiene and grooming, a slightly depressed mood, impaired concentration, diminished recall memory, and fair insight and judgment. Her affect was constricted, stable, and depressed but appropriate. Dr. Qaisrani noted that she became tearful during the evaluation. Dr. Qaisrani questioned whether Plaintiff was being uncooperative. He diagnosed Plaintiff with major depressive disorder, recurrent, severe, without psychotic features; and anxiety disorder. Generalized anxiety disorder was to be ruled out. A GAF score of 57 was assigned. Plaintiff reported that she did not consistently take her medications. Dr. Qaisrani noted the combination of Plaintiff's medication to be "unusual," specifically observing Plaintiff to be prescribed the maximum dosage of Zoloft and a higher dosage of Abilify and trazodone. He opined that her current medication regimen might reduce her drive and energy level, but, given that it was her first appointment,

decided not to then adjust her medications. Plaintiff was to return in four weeks. (Id. at 590-93.)

That same month, a CSS plan was developed by BJC Behavioral Health in order that Plaintiff would receive services to assist with excessive worry and sadness. It was noted that CSS would attend Plaintiff's psychiatric appointments with her and provide transportation as needed. (Id. at 604-06.)

Plaintiff returned to Dr. Qaisrani in September, reporting feeling depressed, crying, and having a sense of helplessness. She was excessively worrying, having periodic intense anxiety with shaking, and also experiencing low energy, drowsiness, poor motivation, and anhedonia. On examination, hygiene was fair, her psychomotor activity was reduced, her speech was normal, her thought process was goal directed, her insight and judgment were intact, and her affect was stable, constricted, and depressed. Dr. Qaisrani repeated his diagnoses and determined to taper Plaintiff off of Abilify and reduce her dosage of trazodone in order to lessen her excessive sedation. Plaintiff was instructed to continue with case management services and to return in two weeks. (Id. at 594.) At that follow-up appointment, Plaintiff reported continued depression, helplessness, excessive worrying, poor motivation, and anhedonia. She had had a slight improvement in her energy level. Dr. Qaisrani prescribed Wellbutrin as an adjunct for severe and resistant depression. (Id. at 596.)

Plaintiff returned to Dr. Qaisrani in October. He noted that her mood, energy, and motivation had improved. Plaintiff reported a reduction in worrying with no feelings of panic or shakiness. Plaintiff reported no anhedonia. She occasionally felt depressed and was

excessively drowsy in the morning. Her mental status examination was unremarkable. Dr. Qaisrani reduced Plaintiff's dosage of trazodone to avoid the excessive drowsiness. Her dosage of Zoloft was also reduced. (Id. at 598.)

Also before the ALJ were assessments of Plaintiff's mental abilities and limitations.

In June 2009, Kyle DeVore, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that Plaintiff's major depression and anxiety disorder resulted in moderate limitations in activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, or pace; and resulted in no repeated episodes of decompensation of extended duration. (Id. at 496-506.)

In a Mental RFC Assessment completed that same date, Dr. DeVore opined that in the domain of understanding and memory, Plaintiff was moderately limited in her ability to understand and remember detailed instructions but was not otherwise limited. In the domain of sustained concentration and persistence, Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. In the domain of social interaction, Plaintiff was moderately limited in her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without

distracting them or exhibiting behavioral extremes. Finally, in the domain of adaptation, Dr. DeVore opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, but was not otherwise significantly limited. He concluded that Plaintiff was capable of performing the basic mental demands of competitive unskilled work and would benefit from limited social contact. (Id. at 507-09.)

On October 20, 2009, Dr. Byrd completed a checklist Mental Medical Source Statement ("MMSS"), listing Plaintiff's current diagnosis to be major depression, severe, recurrent, and opining that Plaintiff had extreme limitations in all domains of functioning and was unable to work. Dr. Byrd stated that Plaintiff was "extremely depressed and dysfunctional." (Id. at 542-45.)

In a checklist MMSS completed in December 2011, Dr. Qaisrani listed Plaintiff's diagnoses as major depressive disorder, recurrent, severe, and anxiety disorder, not otherwise specified. He noted that generalized anxiety disorder was to be ruled out. He opined that Plaintiff experienced marked limitations in her activities of daily living and moderate-to-marked limitations in social functioning. With respect to concentration, persistence, or pace, Dr. Qaisrani opined that Plaintiff was extremely limited in her ability to respond to changes in the work setting; markedly limited in her ability to maintain attention to work tasks for up to two hours, perform at a consistent pace, sustain an ordinary routine without special supervision, and work in coordination with others; and moderately limited in her ability to understand and remember simple instructions and make simple

work-related decisions. He further opined that Plaintiff's impairment would often cause ongoing interruptions during a normal workday or workweek. (Id. at 607-10.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through September 30, 2011. She next found that Plaintiff had not engaged in substantial gainful activity since January 16, 2008, the alleged onset date of disability. The ALJ found that Plaintiff's major depressive disorder and obesity were severe impairments. Plaintiff did not, however, have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix. 1.[8]

Addressing Plaintiff's RFC, the ALJ found that Plaintiff can perform medium work and can understand, remember, and carry out at least simple and non-detailed tasks. The VE's testimony supported a finding that Plaintiff's RFC did not preclude the performance of her past relevant work as a convenience store clerk, hotel housekeeper, order picker, and prep cook. Accordingly, the ALJ concluded that Plaintiff was not under a disability from January 16, 2008, through the date of the decision. (Id. at 10-19.)

## Discussion

To be eligible for DIB and SSI under the Social Security Act, Plaintiff must prove that she is disabled. **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001); **Baker v. Secretary of Health & Human Servs.**, 955 F.2d 552, 555 (8th Cir. 1992). The Act defines

_____

[8]The ALJ did not find that Plaintiff's headaches were a severe impairment, nor did the ALJ attribute any limitation to them. Plaintiff does not challenge these findings.

disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; **Bowen v. Yuckert**, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the

claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); **Richardson v. Perales**, 402 U.S. 389, 401 (1971); **Estes v. Barnhart**, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. **Johnson v. Apfel**, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." **Coleman v. Astrue**, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." **Id.** (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The Plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The Plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the Plaintiff's impairments.

6.	The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

**Stewart v. Secretary of Health & Human Servs.**, 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  **Coleman**, 498 F.3d at 770; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  **Pearsall**, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."  **Weikert v. Sullivan**, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also **Jones ex rel. Morris v. Barnhart**, 315 F.3d 974, 977 (8th Cir. 2003).

In her first decision, the ALJ found Plaintiff to have the RFC to

perform a full range of work at all exertional levels.  She can understand, remember and carry out at least simple instructions and nondetailed tasks; maintain concentration and attention for two hour segments over an eight hour period, demonstrate adequate judgment and make adequate decisions, respond appropriately to supervisors and co-workers in a task oriented setting where contact with others is casual and infrequent, adapt to routine/simple work changes, take appropriate precautions to avoid hazards, perform repetitive work according to set procedures, sequence or pace, perform some complex tasks, and perform work at a normal pace.

(R. at 78.) Noting this RFC to be inconsistent with the ALJ's findings earlier in that same decision that Plaintiff had no limitations in her ability to perform activities of daily living or social functioning, and inconsistent with her subsequent finding that Plaintiff could perform her past relevant work as a healthcare provider given the frequent contact with others required to perform such work, the Appeals Council remanded the matter to the ALJ to give further consideration to Plaintiff's RFC. (Id. at 91-93.) On remand, the ALJ conducted further proceedings, obtained additional evidence, and revised her RFC determination to find that Plaintiff has the RFC to perform medium exertional work and to understand, remember, and carry out at least simple and non-detailed tasks. No other RFC findings were made.

Plaintiff claims that the ALJ's RFC redetermination essentially eliminated the restriction from the first decision that prevented her from performing her past relevant work, arguing this to be an inappropriate response to the Appeals Council remand order. The ALJ did not err in this redetermination.

An ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. §§ 404.977(b); 416.1477(b). Failure to adhere to the agency's remand order in subsequent administrative proceedings is itself legal error. **Hill v. Astrue**, No. 1:12CV56 DDN, 2013 WL 4054688, at *11 (E.D. Mo. Aug. 12, 2013), *aff'd sub nom.* Hill v. Colvin, 753 F.3d 798 (8th Cir. 2014). Here, the Appeals Council noted inconsistencies in the ALJ's original written decision and remanded the matter to the ALJ to "[g]ive further consideration to the claimant's maximum residual functional capacity," Record at 92), which is what the

ALJ did upon remand. Although the ALJ's subsequent RFC assessment imposed fewer limitations than the original assessment, a less restrictive RFC upon remand cannot in itself constitute a basis upon which to reverse the ALJ's decision if the less restrictive RFC is supported by substantial evidence on the record as a whole. See **Id.** at \*\*12-13. For the following reasons, a reasonable mind can accept the ALJ's less limiting RFC assessment when viewed in light of the record as a whole and, as such, the RFC assessment must stand. See **Hill**, 753 F.3d at 800 (citing Perks v. Astrue, 687 F.3d 1086, 1091 (8th Cir. 2012)).

Residual functional capacity is the most a claimant can do despite her physical or mental limitations. **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005); **Eichelberger v. Barnhart**, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination. **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010); **Eichelberger**, 390 F.3d at 591; **Hutsell v. Massanari**, 259 F.3d 707, 711-12 (8th Cir. 2001). Accordingly, the ALJ must "consider at least some supporting evidence from a [medical professional]" and should obtain medical evidence that addresses the claimant's ability to function in the workplace. **Hutsell**, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment

which is not properly informed and supported by some medical evidence in the record cannot stand.  **Id.**

Plaintiff claims that evidence submitted subsequent to the Appeals Council's remand order strengthens the ALJ's May 2010 RFC finding that Plaintiff should work in a setting where contact with others is casual and infrequent, and thus that the ALJ's determination to omit this limitation from the March 2012 RFC assessment is not supported by substantial evidence.  Plaintiff also argues that the ALJ erred by discounting opinion evidence from Drs. Byrd and Qaisrani.

In her March 2012 written decision, the ALJ summarized the evidence of record obtained subsequent to the Appeals Council remand order, specifically noting that exacerbations in Plaintiff's symptoms were related to situations involving her children and that Plaintiff was not always compliant with her treatment regimen.  The ALJ noted mental status examinations included numerous findings that were essentially normal and inconsistent with Plaintiff's subjective complaints, and that GAF scores were consistent with moderate symptoms.  Substantial evidence on the record as a whole supports these findings.  A review of the entirety of the record shows that any difficulty experienced by Plaintiff interacting with others involved interacting with her children during situational stressors.  As noted by the ALJ, the record shows Plaintiff to have interacted appropriately with her doctors, attorney, and personnel at the administrative hearings, and that Plaintiff successfully attended numerous other court proceedings relating to her daughter.  The record also shows Plaintiff's condition to improve when she was compliant with medication and that recent adjustments

to the medication regimen ameliorated many of Plaintiff's symptoms and complaints.  See **Gates v. Astrue**, 627 F.3d 1080, 1082 (8th Cir. 2010) (ALJ did not err in finding claimant's depression not to be severe inasmuch as it was situational in nature, related to marital issues, and improved with medication and counseling).  While evidence in the record also supports a contrary conclusion, a reasonable person could find the evidence adequate to support the ALJ's decision and it must therefore be affirmed.  **Id.**; see also **Owen v. Astrue**, 551 F.3d 792, 797-98 (8th Cir. 2008) (ALJ's decision not to be reversed if it falls within "available zone of choice").

The Court notes that the VE testified that a person whose contact with others was limited to less than ten percent per day can perform Plaintiff's past work as a hotel housekeeper, explaining that housekeepers have very little contact with other persons in the hotel and that "when you work with housekeepers, they usually get their assignments in the morning, and that usually takes 10 to 15 minutes and that would be less than 10 percent of the day."  (R. at 65.)  The ALJ relied on VE testimony to find Plaintiff able to perform this past relevant work, which an ALJ is permitted to do at step four of the sequential analysis.  See **Wagner v. Astrue**, 499 F.3d 842, 853-54 (8th Cir. 2007).  Therefore, to the extent it can be argued that the ALJ erred by failing to include in her March 2012 RFC a finding that Plaintiff was limited to working in a setting where contact with others is casual and infrequent, the error appears to be harmless and does not require remand given vocational expert testimony that a person with such limitation could continue to perform Plaintiff's past relevant work as a housekeeper.  See **Hepp v. Astrue**, 511 F.3d 798, 806 (8th Cir. 2008)

(declining to remand for alleged error in opinion when error "had no bearing on the outcome") (internal quotation marks omitted).

Additionally, the ALJ's determination to discount the opinion evidence from Drs. Byrd and Qaisrani is supported by good reasons and substantial evidence on the record as a whole, and Plaintiff's claim otherwise fails. In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. See 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii).[9] The Regulations require that more weight be given to the opinions of treating physicians than other sources. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also **Forehand v. Barnhart**, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of

---

[9]Citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the 2011 version of the Regulations which were in effect at the time the ALJ rendered her final decision. The most recent amendments to the Regulations, effective March 2012, reorganize the relevant subparagraphs but do not change their substance.

individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, a medical source's opinion that an applicant is unable to work involves an issue reserved for the Commissioner and is not the type of opinion which the Commissioner must credit. **Ellis v. Barnhart**, 392 F.3d 988, 994-95 (8th Cir. 2005).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In her decision, the ALJ accorded considerable weight to the office records of Plaintiff's treating psychiatrists but determined to accord little weight to the marked and extreme limitations as opined in their respective MMSSs. (See R. at 18.) This is not error. With respect to Dr. Byrd's October 2009 MMSS, the ALJ accorded it little weight inasmuch as it was inconsistent with the observations made in the CSS assessment that he had signed and authorized in August 2009. (Id.) This CSS assessment showed Plaintiff to be fully

- 31 -

oriented, calm, cooperative, pleasant, and to display normal memory. Plaintiff was occasionally defensive and appeared guarded with some responses, but her judgment was fair. The undersigned also notes that the September 2009 CSS quarterly review showed Plaintiff to be meeting social, legal, and employment responsibilities and to be exhibiting moderate symptoms of her condition as demonstrated by the then-current GAF score of 55. Dr. Byrd signed this review one week before he completed the MMSS wherein he opined that Plaintiff suffered extreme limitations in all domains of functioning. An ALJ is entitled to discount a treating physician's opinion where that physician has rendered inconsistent opinions. **Wagner**, 499 F.3d at 850. In addition, as noted by the ALJ in her May 2010 decision, the extreme limitations set out in Dr. Byrd's October 2009 MMSS were inconsistent with his treatment notes that showed Plaintiff to exhibit many normal behaviors during mental status examinations, to report that she did her own shopping and prepared her own meals, and did not demonstrate severe psychiatric or psychological symptoms. (See R. at 82.) Where the limitations set out in a treating physician's medical source statement "stand alone" and were "never mentioned in [the physician's] numerous records or treatment" nor supported by "any objective testing or reasoning," the ALJ's decision to discount the treating physician's statement is not error. **Hogan v. Apfel**, 239 F.3d 958, 961 (8th Cir. 2001).

Likewise, the ALJ accorded little weight to Dr. Qaisrani's December 2011 MMSS, finding the opined limitations expressed therein to be inconsistent with his own treatment records and to fail to take into account Plaintiff's noncompliance with her treatment regimen. This is not error. Dr. Qaisrani began treating Plaintiff in August 2011 at which time he

assigned a GAF score indicating moderate symptoms, with mental status examination showing Plaintiff not to exhibit marked behavioral deficiencies. While Plaintiff was noted to be "a little depressed" and constricted, she established appropriate rapport and demonstrated fair insight and judgment. To the extent impaired concentration and memory were observed at that time, Dr. Qaisrani noted that Plaintiff's uncooperativeness could be contributing to such behavior. In Dr. Qaisrani's subsequent treatment notes, it was noted that Plaintiff improved with adjustments to medication, and mental status examinations yielded essentially normal results. Because a review of Dr. Qaisrani's treatment notes shows him to have made no observations showing Plaintiff to experience the significant and debilitating limitations as set out in his December 2011 MMSS, the ALJ did not err in according less than controlling weight to Dr. Qaisrani's opinions. See **Charles v. Barnhart**, 375 F.3d 777, 784 (8th Cir. 2004). See also **Renstrom v. Astrue**, 680 F.3d 1057, 1064 (8th Cir. 2012) (holding that an ALJ may give less than controlling weight to treating physician's opinions where they are largely based on claimant's subjective complaints).

Finally, a review of the record shows Plaintiff to have periodically been noncompliant with her medication regimen, and that she experienced an exacerbation of symptoms during such periods of noncompliance. The limitations set out in Dr. Qaisrani's MMSS rendered Plaintiff functionally unable to perform any work activity; but in this MMSS, Dr. Qaisrani did not account for Plaintiff's noncompliance with her medication and treatment regimen - a regimen that improved Plaintiff's condition when followed. In light of this evidence, the

ALJ did not err in considering Dr. Qaisrani's failure to account for Plaintiff's noncompliance in her determination to discount this psychiatrist's opinion. **Owen**, 551 F.3d at 799-800.

Accordingly, because the ALJ's determination to accord little weight to the opinions expressed in Drs. Byrd's and Qaisrani's MMSSs is supported by good reasons and substantial evidence, the Court defers to this determination.

## Conclusion

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole. **Davis v. Apfel**, 239 F.3d 962, 966 (8th Cir. 2001). "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." **Id.** Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. **Id.**; see also **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011); **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001).

For the reasons set out above on the claims raised by Plaintiff on this appeal, a reasonable mind can find the evidence of record sufficient to support the ALJ's determination that Plaintiff was not disabled from January 16, 2008, through the date of the decision. Because substantial evidence on the record as a whole supports the ALJ's decision, it must be affirmed. **Davis**, 239 F.3d at 966. This Court may not reverse the decision merely because substantial evidence exists that may support a contrary outcome. Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and this case is **DISMISSED**.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of August, 2014.